JEREMY T. NAFTEL (SBN 185215)
LAUREN B. KALFSBEEK (SBN 322153)
ALEX A. SMITH (SBN 317224)
alexsmith@martensonlaw.com
MARTENSON, HASBROUCK & SIMON LLP
455 Capitol Mall, Suite 400
Sacramento, California 95814
Telephone:   (916) 970-1434
Facsimile:    (404) 909-8120

Attorneys For Plaintiff
UNIVERSAL PROTECTION SERVICE, LP D/B/A ALLIED UNIVERSAL
SECURITY SERVICES

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNIVERSAL PROTECTION SERVICE, LP d/b/a ALLIED UNIVERSAL SECURITY SERVICES, | CASE NO.: |
| | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| Plaintiff, | |
| v. | |
| AVE SELTSAM, | |
| Defendant. | |

## COMPLAINT

Plaintiff Universal Protection Service, LP d/b/a Allied Universal Security Services ("Allied Universal" or "Plaintiff"), by and through its undersigned counsel, hereby files this Complaint for Damages and Injunctive Relief against Defendant Ave Seltsam ("Seltsam" or "Defendant"), respectfully showing this Court as follows:

## INTRODUCTION

This action is brought to halt an ongoing, unlawful scheme by a former high-level employee who has exploited a position of trust for personal gain. In brazen violation of her contractual, common law, and statutory obligations, Defendant has engaged in a campaign to steal trade secrets and other confidential information from Allied Universal. Specifically, Allied Universal has discovered that, *while still employed by Allied Universal*, Defendant emailed numerous files containing confidential and proprietary information stored on her Allied Universal computer and on the company's intranet to her personal email account. She subsequently accepted employment with one of Allied Universal's competitors, putting her in a position to use these trade secrets to Allied Universal's detriment. Defendant has violated—and, absent judicial intervention, will continue to violate—her legal obligations to Allied Universal. This suit is, regrettably, necessary to avoid immediate and irreparable harm to Allied Universal, pending an adjudication of the merits of this case and a hearing on Allied Universal's application for a permanent injunction.

## PARTIES

1.    Allied Universal is a California limited partnership with its principal places of business in Santa Ana, California and Conshohocken, Pennsylvania.

2.     Ave Seltsam ("Seltsam") is an individual resident of the State of California. She can be served at her home address of 29 Augusta Circle, Petaluma, CA 94952.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 because Allied Universal's claim against Defendant under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., raises a federal question. Allied Universal's remaining claims fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy.

4.     Seltsam is subject to the jurisdiction of this Court because she is a resident of the State of California.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.     Allied Universal's Business Operations.**

6.     Allied Universal is a security services company that provides customized security solutions and supplies security guards to a wide array of end-customer businesses and sites, including offices, retail establishments, storage facilities, construction sites, and other locations through the United States.

7.     Over the years, Allied Universal has developed customized business plans for security solutions that are the primary key to its growth and success. Allied Universal has also researched and invested in technology and strategically implements tools that are best suited to each individual customer. Allied Universal works with each customer to design custom and cost-effective security solutions to fit their needs. Every customer has different security needs according to its business, user demographic, and requests of the owners and operators. Even among

similar businesses, the best security approach will differ based on the personalities of its patrons and preferences of the owners or operators.

8.     Allied Universal has developed and maintained confidential and proprietary marketing plans and strategies, pricing platforms and fee structures, bid information, leads reports, and confidential contact information for all its prospective customers.

**B.     Defendant's Role with Allied Universal**

9.     In or around May 2021, Allied Universal offered Seltsam a position as Business Development Manager.  Seltsam accepted the position soon thereafter.

10.    Prior to her hiring by Allied Universal, Seltsam was employed by G4S Secure Solutions, Inc. ("G4S"). Seltsam was hired by Allied Universal as part of Allied Universal's acquisition of G4S. Prior to her hire by Allied Universal, Seltsam held the same position with G4S.

11.    Seltsam's primary responsibilities as Business Development Manager included, among others: establishing, developing and fostering quality business relationships within the territory to position Allied Universal as the most responsive security provider; establishing relationships with potential clients to distinguish Allied Universal from the client's current provider and delivering tailored solutions professionally and effectively; prospecting through innovative lead generation tools and leveraging existing advanced and dedicated social media opportunities; perpetuating and amplifying a professional local brand to enhance the company brand to attract a following of targeted connections and relationships; identifying and recognizing the unique buyer in the buying process map to leverage and nurture connections to productive relationships; and collaborating with the Branch Manager and operations team in the region to demonstrate the resources and expertise of Allied Universal to clients during the sales process to ensure

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

confidence in the value and competence of the operations team after the sale during implementation of services.

12.   As Business Development Manager, Seltsam was integral to Allied Universal's business operations. She was responsible for expanding and developing Allied Universal's business portfolio in the San Francisco Bay area. Seltsam had intimate knowledge of Allied Universal's custom and cost-effective security solutions with access to sensitive and confidential pricing information, business plans, marketing strategies, leads reports, and other non-public information. Seltsam managed customer relationships in diverse industries for Allied Universal in the San Francisco Bay area.

13.   As part of her employment with Allied Universal, Seltsam would retain access to G4S's confidential information and goodwill, which were acquired by Allied Universal as part of its acquisition of G4S. Moreover, Seltsam would also have access to Allied Universal's confidential information and information regarding Allied Universal's customers.

14.   Because of Seltsam's continued and increased access to G4S's and Allied Universal's confidential information and customer relationships, and as a condition of her employment, Seltsam executed a Confidentiality and Non-Solicitation Agreement (the "Agreement") on May 14, 2021. A true and correct copy of the Agreement is attached hereto as Exhibit A.

15.   Seltsam had intimate knowledge of Allied Universal's custom and cost-effective security solutions.

16.   Since May 2021, Seltsam has been the face of Allied Universal's business development in the San Francisco Bay area and was responsible for customer relationship management with existing customers, regular customer interface, development and execution of business strategy, and analyzing and delivering sales.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

17.    Seltsam had substantial business development responsibilities at Allied Universal.

18.    Seltsam was intimately involved in the "pitch" or bidding processes for new customers in the San Francisco Bay area, which including working closely with operations to market Allied Universal's unique service offerings and tailor them to prospective customers in a cost-effective and competitive bid.

19.    Allied Universal provided Seltsam with leads developed by the Company.

20.    Because of her intimate work in sales and the bidding process, Seltsam had access to Allied Universal's proprietary marketing plans and strategies, pricing platforms and fee structures, bid information, leads reports, and confidential contact information for all of Allied Universal's prospective customers in the market.

21.    Each customer's preferences are unique and learning each customer's specific preferences takes a considerable investment of time and money.

22.    Seltsam's responsibilities included ensuring that Allied Universal delivered on each of its customer's expectations.

23.    Fulfilling this responsibility required frequent discussions and reviews with each client about its security needs and preferences to ensure that Allied Universal's services were in line with those needs and preferences.

24.    Seltsam not only knew about Allied Universal's strategies and business development goals, but she also had knowledge about the operational specifications for each customer and customer preferences.

25.    Because she was responsible for maintaining the quality of existing customer relationships, in addition to driving sales with new customers, Seltsam had access to Allied Universal's customers in California, including their pricing structures, cost structures, billing and payment practices, contact information,

unique site requirements, and plans for future business or other development with those customers, including prospective cross-marketing opportunities for related Allied Universal service providers.

26.     Seltsam has access to account profitability analyses and confidential information regarding which clients had the largest volume of security employees, which invested most in security equipment, which had the highest security personnel turnover rates, which were trending in various directions, and which were most susceptible to leaving for a competitor and why.

27.     Allied Universal invested a tremendous amount of time and money in Seltsam for her to effectively do her job. Seltsam's annual compensation was in excess of $300,000, commensurate with the level of trust and responsibility required of her position with Allied Universal.

**C.     Defendant's Agreement Contains Lawful Post-Employment Restrictions**.

28.     As a condition of her Employment with Allied Universal, Seltsam was required to sign the Agreement. In furtherance of protecting Allied Universal's proprietary information, all managers at or above Seltsam's level were required to sign similar agreements during the course of their employment with Allied Universal.

29.     The Agreement maintains several provisions intended by the parties to protect Allied Universal against unlawful competition and unfair use of its information and goodwill.

30.     The Agreement contains a confidentiality provision, which states, in pertinent part:

> 1.  **Confidential Information Defined**.  "Confidential Information" means: (a) any "trade secret" as defined in *California Civil Code* section 3426 et seq.; and (b) any

information not widely and readily accessible to the general public that becomes known to me, directly or indirectly, as a result of my contact with the Company, which relates to the business, finances or operations of the Company, its clients, vendors or any other third party with whom the Company has an existing or prospective relationship. Such Confidential Information includes, without limitation, business and financial information, technical information, know-how and ideas. This information may relate, for example, to technology, processes, products, programs, software in source or object code, improvements, developments, discoveries, inventions, computer hardware, computer software, vendors, suppliers, consultants, design, research, development, engineering, accounting, selling, marketing, pricing, staffing, security protocols, post orders, and any actual or contemplated trademark, service mark, trade name or patent. The information described in this Section 1 is Confidential Information no matter how obtained, and regardless of whether such information is intangible (such as a fact known to me but not recorded), recorded in written form (such as a letter, memorandum or other document), or otherwise records (such as a photograph, videotape, audiotape, computer disk, or other electronic media). By way of example and not limitation, such information would be Confidential Information regardless of whether I acquired it by observing documents, things or

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

people, by direct communications with an employer, owner, manager, or contractor of the Company, or by overhearing conversations on the telephone or otherwise. Confidential Information expressly includes the identities, goals, needs, preferences and strategic plans of individuals and entities served by the Company (collectively. "Company Clients"). I understand and acknowledge that information concerning Company Clients has independent economic value to the Company and is not readily ascertainable from public sources. I further understand and acknowledge that the Company has expended considerable time and effort to develop, compile and protect the confidentiality of that information.

2. **<u>No Disclosure</u>**. I agree that at all times, both during and after the time when I am providing services to the Company, I must maintain the confidentiality of all Confidential Information. That is, unless I have received prior express written consent from the Company's CEO in each instance, I will not summarize, copy, disclose, reverse engineer, or otherwise communicate any Confidential Information to any person or entity, whether directly or indirectly, except to the limited extent actually necessary to perform services for the Company. Notwithstanding the foregoing, nothing in this Agreement prohibits me from reporting waste, fraud, abuse and/or possible violations of law or regulation to any government agency or entity or making other disclosures that are protected under the whistleblower provisions of federal, state, or local law or regulation. Solely in connection with such reporting, I understand that I can disclose Confidential Information in confidence, to a government official or to an attorney to address possible violations of the law; however, any disclosure of Confidential Information must be in good faith and effectuated in a manner that prevents the dissemination of Confidential Information beyond those persons necessary to make the report or filing, such as filing Confidential Information under seal and otherwise preventing it from being publicly disclosed. I understand that while I am encouraged to bring any such possible violation to the attention of the

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Company, I do not need the prior authorization of the Company to make any such reports or disclosures to these entities.

3. **Return of Confidential Information**. If the Company provides me with any Confidential Information in a tangible form, I agree to return all such materials (including originals and all copies thereof) immediately to the Company upon request. I recognize that the unauthorized taking of any Confidential Information may be a crime under section 499c of the *California Penal Code*, and may result in civil liability under sections 3426.1 through 3426.11 of the *California Civil Code* and section 2860 of the *California Labor Code*.

31.    The Agreement also contains a non-solicitation provision, which states, in pertinent part:

5. **No Solicitation/Interference**. While I am providing services to the Company, I will not provide services, directly or indirectly, to any individual or entity other than the Company, if such person or entity is engaged in, or preparing to engage in, the business of developing and running a private patrol/security services business.

I further agree that while I am providing services to the Company, and for a period of two (2) years after I stop providing services to the Company for any reason, I will not use any Confidential Information to solicit or attempt to solicit, on behalf of any person or entity other than the Company, business from any Company Client I serviced,

directly or indirectly, as a result of my employment with the Company. I further agree that while I am providing services to the Company, and for a period of six (6) months after I stop providing services to the Company for any reason, I will not through unfair competition directly or indirectly solicit or attempt to solicit for employment, on behalf of any person or entity other than the Company, any Company employee or any employee employed by the Company six (6) months prior to the end of Employee's employment with the Company.  "Unfair competition" includes, but is not limited to, unfairly disrupting, damaging, impairing, or interfering with the Company by using the Company's trade secrets or Confidential Information to solicit employees, or using any non-public information or documents, of any kind or in any form, obtained during or derived from Employee's employment with the Company to solicit employees.  The foregoing employee non-solicitation provision shall not be applicable to general solicitations in newspapers, trade magazines, internet job sites, or other similar media not specifically targeting employees of the Company, and any hiring resulting therefrom, nor shall this provision preclude me from accepting and considering job inquiries from employees of the Company.

**D.** **Allied Universal's Protection of Its Proprietary Information**

32.    Much of the value of the information provided to Seltsam comes from the fact it is not known to Allied Universal's competitors.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

33.    For example, having information about its customers or customers' unique business needs and preferences allows Allied Universal to tailor its sales approach that is superior to their competitors. Allied Universal has expended great resources in determining customer's unique business needs and tailoring customized security solutions to fit those needs.

34.    Allied Universal's market superiority would be diminished if its competitors could similarly tailor their information using this information.

35.    Knowledge of Allied Universal's customer lists and contact information, in addition to knowledge of pricing and formulae, would allow competitors to identify Allied Universal's clients and seek to under the Company's pricing of customized security solutions.

36.    Because of the immense value and sensitivity of Allied Universal's operational protocols, business and strategy plans, and customer information, Allied Universal takes concrete steps to protect the confidentiality of this proprietary information.

37.    Each computer issued to a company employee is password-protected and requires multiple log-ins in order to access the application and software programs.

38.    Allied Universal employees have varying levels of access to Allied Universal's software and application tools, which is based on whether they have a legitimate business need to access that level of information.

39.    Allied Universal has an employee handbook that has a provision that discusses confidentiality and the unwavering requirement that employees, and former employees, must not disclose trade secrets.

40.    All Allied Universal employees who are given access to confidential information are required to sign confidentiality agreements similar to Seltsam's Agreement.

**E.**  **Seltsam's Repeated Breach of Contractual, Common Law, and Statutory Obligations.**

41.    In the days and weeks prior to Seltsam's resignation from Allied Universal, Seltsam emailed to her personal email account numerous files containing confidential and proprietary information maintained on her Allied Universal owned laptop and on Allied Universal's intranet and servers.

42.    Seltsam accessed and surreptitiously took, among other things, Allied Universal's customer lists, customer financial information, customer bids, pricing information, leads reports, and other proprietary sales-related information.

43.    On August 24, 2002 at 6:31 am, Defendant emailed to her personal email address an internal Allied Universal document entitled "[Client A] Contract Security Treated Like Family." This document is an internal Allied Universal case study about the development and maintenance of a successful client relationship.

44.    On August 23, 2002 at 11:17 am, Defendant blind copied to her personal email address a document entitled "Allied Universal Security Services Proposal for the [Client B]." This document contains extensive information about Allied Universal's proposal for this account, including pricing and staffing information.

45.    On August 22, 2022 at 2:28 pm, Defendant emailed to her personal email address a document entitled "Transition Plan Template – Legal edits blended." This document contains a summary of Allied Universal's process for successfully transitioning a new account into Allied Universal's operations.

46.    On August 19, 2022 at 6:17 pm, Defendant emailed to her personal email address a document entitled "[Client C] 2023 Budget." This document contains a summary of the work Allied Universal performs at the account, including budget and pricing information.

47.   On August 19, 2022, Defendant emailed herself five (5) separate previous emails that serve as templates for Allied Universal's communications with its clients.

48.   On August 18, 2022 at 4:55 pm, Defendant emailed to her personal email address two documents entitled, "Book1" and "m1." These documents contain names and contact information of over thirty (30) Allied Universal clients.

49.   On August 18, 2022 at 4:05 pm, Defendant emailed to her personal email address a prior email chain, from June 2022, discussing Allied Universal's efforts to retain the business of [Client D].

50.   On July 22, 2022 at 12:54 am, Defendant emailed to her personal email address multiple internal Allied Universal documents, entitled "2023 Rate Increase Process Kickoff," "Dirty Dozen 2022-Lack of Resources," "AU Training Bulletin – Safe and Tactical Interaction", "WFM-Artificial Cell Closing" and "(vignette) Enterprise Accounts – MSA Security_Response to Threats," and "system-lockout.pdf". These documents contain extensive information about Allied Universal's strategies to attract and maintain clients.

51.   On July 18, 2022 at 4:20 pm, Defendant emailed to her personal email address a document entitled "062022 Lead Reports" and the internal email chain discussing the document. This document and the associated email chain contain extensive information about Allied Universal's processes for identifying and following up on potential leads, information about which sources of leads had the most historical success, and the names of multiple new clients of Allied Universal.

52.   On July 14, 2022 at 4:11 pm, Defendant emailed to her personal email address a document entitled "Script." This document contains detailed information regarding Allied Universal's internal program for incentivizing the development of new business leads.

53.     On July 6, 2022 at 3:23 pm, Defendant emailed to her personal email address a document entitled "Copy of [Client E] Budget." This document contains detailed information about one of Allied Universal's clients, including staffing levels and pricing information.

54.     On June 14, 2022 at 2:00 pm, Defendant emailed to her personal email address an email chain entitled "Weekly New Business Report – Privileged." Contained in this email chain was a document entitled "Allied Universal Security Services Revised Pricing Summary." This email chain and the attached document contains extensive information regarding several new Allied Universal clients, including staffing levels, employee wage rates, pricing and billing information.

55.     On May 19, 2022 at 4:25 pm, Defendant emailed to her personal email address several documents, entitled "[Client F] – 2018," "[Client F] Rate Schedule 2016-2019 & 2013-2016" and "[Client F] – Rate Comparison 2017". These documents contain detailed information about one of Allied Universal's clients, including staffing levels and historic pricing and billing information.

56.     On May 5, 2022 at 10:26 am, Defendant emailed to her personal email address a document entitled "PIG Leads – Proposals 2022-04-28-12-26-04." This document contains extensive information regarding potential business leads Allied Universal was pursuing at the time. Many of these companies are still active leads today.

57.     On April 28, 2022 at 5:05 pm, Defendant emailed to her personal email address a document entitled "[Client G] Budget 2018-2019." This document contains extensive information regarding one of Allied Universal's clients, including staffing levels and pricing information.

58.     On April 25, 2022 at 4:38 pm, Defendant emailed to her personal email address a document entitled "Allied Universal Presentation for [Client H]." This document contains Allied Universal's presentation to a potential client.

59.     On April 22, 20022 at 2:21 pm, Defendant emailed to her personal email address a document entitled "2022.04.18_AUS Service Agreement_[Client I]_Comments_AUS 4.20.22 redlines." This document is a draft contract between Allied Universal and one of its customers, and includes extensive information regarding the services Allied Universal would provide, staffing levels and billing information.

60.     On April 14, 2022 at 12:15pm, Defendant emailed to her personal email address a document entitled "Allied Universal Services Agreement for [Client J]." This document is a draft contract between Allied Universal and one of its customers, and includes extensive information regarding the services Allied Universal would provide, staffing levels and billing information.

61.     Allied Universal continues to investigate the scope and amount of confidential and trade secret information Seltsam removed without authorization for her personal use and enrichment.

62.     On August 24, 2022, Seltsam voluntarily terminated her employment relationship with Allied Universal.

63.     Upon information and belief, Seltsam accepted employment with GardaWorld, a competing security services provider.

64.     Upon information and belief, Seltsam intends on using Allied Universal's trade secrets and other confidential and proprietary information to unfairly compete with Allied Universal and solicit its customers.

65.     Seltsam continues to be in possession of Allied Universal's confidential information and trade secrets.

66.     Any one of the above listed illicit incidents of Seltsam sending Allied Universal confidential and trade secret information would be cause for substantial alarm. When viewed in light of her doing so just prior to accepting employment

with Allied Universal's direct competitor, a clear picture emerges of a scheme to abscond with Allied Universal's trade secrets and proprietary information.

67.     This pattern of conduct and Seltsam's continued possession of Allied Universal's confidential information and trade secrets evidence a clear, unlawful threat to Allied Universal's business. This knowledge of Allied Universal's confidential information and possession of its trade secrets outlined above provides Seltsam with a tremendous – and unfair – competitive advantage. Further, it appears certain that Seltsam intends to continue violating the law in order to unlawfully exploit Allied Universal's trade secrets for her own gain.

## FIRST CAUSE OF ACTION

### Violations of 18 U.S.C. § 1832 (Defend Trade Secrets Act of 2016

68.     Allied Universal incorporates by reference Paragraphs 1 through 68 of the Complaint, as if fully set forth herein.

69.     The DTSA, which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures, or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

70.     During the course of her employment with Allied Universal, Seltsam was provided access to substantial amounts of Allied Universal's trade secrets.

71.     Such trade secrets are developed and maintained by Allied Universal at great time, cost, and expense to Allied Universal, and are maintained on password protected networks accessible only by certain high-ranking Allied Universal employees with a need to use such information on the Company's behalf.

72.    Allied Universal instructs these employees to keep trade secret and proprietary Company information confidential.

73.    All employees who have access to this information are required to sign confidentiality agreements.

74.    Allied Universal's trade secrets are not available to the general public and are closely guarded by Allied Universal.

75.    Allied Universal keeps such information strictly confidential in order to maintain a competitive advantage.

76.    The Allied Universal trade secrets entrusted to Seltsam consist of, among other things, documents relating to the resources by which Allied Universal develops proposed bids for clients, strategies on how to obtain future clients, pricing information, information on how to craft the best bid for prospect and renewing clients, and confidential information about accounts Allied Universal is seeking to obtain.

77.    By accessing Allied Universal's confidential information and trade secrets stored on her Allied Universal laptop and on the Company's intranet and sending these items to her personal email shortly before leaving to work for a competitor, Seltsam acquired Allied Universal's trade secrets by improper means and without authorization.

78.    Upon information and belief, Seltsam has used or disclosed and/or intends to use or disclose, Allied Universal's trade secrets on behalf of a competitive company.

79.    Seltsam knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Allied Universal at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Allied Universal's competitors;

(5) would provide significant benefit to a company seeking to compete with Allied Universal; and (6) is critical to Allied Universal's ability to conduct its business successfully.

80.     The information that Seltsam has misappropriated describes and relates to Allied Universal, which involves services that are utilized throughout interstate commerce.

81.     Seltsam has been, and continues to be, unjustly enriched by the misappropriation and/or threatened misappropriation of Allied Universal's trade secrets and confidential information, and, unless restrained, will continue to threaten to use, actually use, divulge, inevitably disclose, and/or otherwise misappropriate Allied Universal's trade secrets and confidential information.

82.     As a result of the threatened and/or actual misappropriation of Allied Universal's trade secrets and confidential information, Allied Universal has suffered, and will continue to suffer, loss of business expectancies, customers, employees, trade secrets, and goodwill in amounts which may be impossible to determine, unless Seltsam is enjoined and restrained by order of the Court.

83.     In addition, Allied Universal seeks actual, incidental, compensatory, punitive, and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

84.     Because Seltsam's misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Allied Universal requests that this Court grant injunctive relief against Seltsam from actual or threatened disclosure or utilization of Allied Universal's trade secrets, in addition to granting Allied Universal its attorneys' fees and exemplary damages.

## SECOND CAUSE OF ACTION

### Breach of Contract

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

85.     Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-85 above, as though set forth fully herein.

86.     Seltsam entered into the Agreement whereby Seltsam owed contractual duties to Allied Universal as set forth more fully above and in Exhibit A.

87.     The Agreement is a valid, enforceable, and binding contract.

88.     Allied Universal performed all of its obligations under the Agreement.

89.     Seltsam breached the Agreement through her conduct of taking confidential and trade secret information from Allied Universal without authorization on multiple occasion and refusing to return the confidential information.

90.     Upon information and belief, Seltsam intends to further breach the Agreement by attempting to use the information for her own gain and enrichment, including but not limited to soliciting one or more of the clients about whom she has obtained Allied Universal's trade secrets.

91.     Seltsam has additionally breached the Agreement by failing to return Allied Universal's property, including confidential and trade secret information, promptly upon her resignation from her employment with Allied Universal.

92.     As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer damages as well as irreparable injury and loss. In addition, Allied Universal is entitled to further equitable relief as set forth in the Agreement.

93.     Allied Universal has been damaged in a sum which is presently unascertainable.

94.     Damages are continuing to accrue, and Allied Universal will present evidence of the exact amount and nature of these damages at the time of trial.

### THIRD CAUSE OF ACTION

**Misappropriation of Trade Secrets in Violation of the Uniform Trade Secrets Act, California Civil Code §3426 et seq.**

95.     Allied Universal re-alleges and incorporates by reference each and every allegation contained in paragraphs 1-95 above, as though set forth fully herein.

96.     Allied Universal was in possession of certain trade secrets that are protected under the California Uniform Trade Secrets Act, California Civil Code § 3426 et seq. These trade secrets include confidential and proprietary information regarding, but not limited to, names and addresses and customer preferences requirements of persons/entities who buy products and services from or through Allied Universal, as well as Allied Universal's costs and pricing structures; bidding strategies and processes; contract information; leads reports and sales strategies; and other confidential and proprietary information regarding Allied Universal's strategy for competing against other companies in its field.

97.     The above-described trade secrets are of substantial value to Allied Universal. They are of independent economic value because they are based on information not generally known within the trade or by other persons or entities who could obtain economic value from their use or disclosure, and because are the product of many years of practice, development, and improvement (through a considerable effort of time and expense), which allow Allied Universal to provide quality service at competitive prices.

98.     Allied Universal made reasonable efforts to ensure that the above-described trade secrets remained secret and protect them from disclosure to its competitors or potential competitors, including by entering into the Agreement with Seltsam, which requires that Allied Universal's trade secrets be kept in the

strictest confidence. Seltsam knew and understood that Allied Universal sought to protect the confidentiality of its trade secret information.

99.   Allied Universal entrusted Seltsam, while she was employed with Allied Universal, with the above-described trade secrets so she could perform her job effectively for Allied Universal's benefit.

100.   Seltsam misappropriated the above-described trade secrets by obtaining, using, or improperly disclosing information provided to Seltsam by Allied Universal's in confidence for the purpose of attaining an unfair competitive advantage and causing injury to Allied Universal. As set forth above, among other things, this included Seltsam's misappropriation of bidding, pricing, service, and cross-marketing trade secrets regarding Allied Universal's current and potential customers.

101.   Upon information and belief, unless restrained by this Court, Seltsam will use these trade secrets to compete unfairly with Allied Universal.

102.   As a direct and proximate result of this conduct, Allied Universal has suffered and, if the conduct is not stopped, will continue to suffer substantial damages as well as irreparable injury and loss. Allied Universal is entitled to lost profits suffered as a result of Allied Universal's conduct in an amount to be determined at trial and for the costs and fees incurred in prosecuting this action.

103.   Allied Universal has been damaged in a sum which is presently unascertainable.

104.   Damages are continuing to accrue. Allied Universal seeks leave of court to present evidence of the exact amount and nature of these damages at the time of trial.

105.   Seltsam performed the foregoing acts, conduct, and omissions (and will continue to do so) intentionally, maliciously, and oppressively, with the intent and design to damage Allied Universal's business and improve business for herself

and for other entities, thereby warranting an award of exemplary damages, as provided by Civil Code §3426.3(c) and an award of reasonable attorneys' fees as provided by Civil Code §3426.4.

## FOURTH CAUSE OF ACTION

### Breach of the Duty of Loyalty

106.   Allied Universal incorporates by reference Paragraphs 1 through 106 of the Complaint, as if fully set forth herein.

107.   As a Business Development Manager, Seltsam was placed in a high-level position of confidence and trust at Allied Universal and was expected to devote her full time to the development and promotion of Allied Universal's business interests.

108.   As a result of this special relationship, Seltsam owed, among other things, a duty to not use her position improperly to profit personally or to assist others in profiting at Allied Universal's expense. She was further expected to avoid situations that might influence her actions or prejudice her judgment in handling Allied Universal business.

109.   However, during the course of her employment with Allied Universal, Seltsam breached her duty of loyalty by, among other things, sending current client pricing lists and existing client lists to her personal email address and downloading large amount of confidential and proprietary information from her Allied Universal's laptop and emailing the confidential documents and trade secrets to her private email address aveseltsam@gmail.com, while still employed by and receiving a paycheck from Allied Universal.

110.   As a direct and proximate result of Seltsam's breach of the duty of loyalty owed to Allied Universal, Allied Universal has suffered, and will continue to suffer, financial loss and other damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**Conversion**

111.    Allied Universal incorporates by reference Paragraphs 1 through 111 of the Complaint, as if fully set forth herein.

112.    Allied Universal has a legal right of possession to the files contained on its internal computer network or the Allied Universal laptop computer utilized by Seltsam, including the files discussed above that Seltsam accessed by sending to her private email address ("Converted Files").

113.    Seltsam had no legal claim to the Converted Files that Seltsam took from her Allied Universal laptop and emailed to her private email.

114.    With the filing of the instant Complaint, Allied Universal made a contemporaneous demand for the return of the Converted Files, but Seltsam has failed to provide them. A true and correct copy of the demand letter is attached hereto as Exhibit B.

115.    Seltsam acted willfully and maliciously in an effort to abscond with Allied Universal' confidential and property information and trade secrets.

## **PRAYER FOR RELIEF**

WHEREFORE, Allied Universal respectfully request judgment in their favor and against Seltsam as follows:

(a)    Issuing a preliminary and permanent injunction preventing Seltsam from continuing her unlawful acts as set forth herein;

(b)    Awarding actual damages resulting from Seltsam's wrongful conduct alleged herein, in an amount to be proven at trial;

(c)    Awarding liquidated damages in the amount of $100,000 per breach of the Agreement resulting from Seltsam's wrongful conduct alleged herein;

(d)    Awarding punitive damages for Seltsam's malicious, willful, wanton, intentional, and legally unjustified misconduct;

(e)     Awarding Allied Universal its attorneys' fees, costs, and other expenses incurred in this action; and

(f)     Granting Allied Universal such other and further relief as this Court deems just and proper.


DATE: August 29, 2022          MARTENSON, HASBROUCK & SIMON, LLP


By:   _/s/ Lauren B. Kalfsbeek_____
        Jeremy T. Naftel
        Lauren B. Kalfsbeek
        Alex A. Smith

        Attorney for Plaintiffs
        UNIVERSAL PROTECTION SERVICE, LLC
        d/b/a ALLIED UNIVERSAL SECURITY
        SERVICES, and G4S SECURE SOLUTIONS
        (USA), INC